IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jeffery Joe, | ) | C/A No.: 3:19-823-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION AND |
| Kershaw County Sheriff's Office, | ) | ORDER |
| Kershaw County, Brad Lawson, | ) | |
| and Justin Spivey, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Jeffery Joe ("Plaintiff") brought this action pursuant to 42 U.S.C. § 1983, asserting (1) a Fourth Amendment violation against Brad Lawson ("Lawson") and Justin Spivey ("Spivey") for use of excessive force during Plaintiff's arrest, (2) claims against Kershaw County Sheriff's Office ("KCSO") for battery pursuant to the South Carolina Tort Claims Act ("SCTCA"), and (3) claims for negligence and gross against KCSO and Kershaw County as it pertains to medical care rendered to Plaintiff, also pursuant to the SCTCA.[1]

This matter is before the court on Defendants' motion for summary judgment [ECF No. 20]. The motion having been fully briefed [ECF Nos. 20, 24, 27], it is ripe for disposition. Also before the court is Plaintiff's motion for

---

[1] Plaintiff additionally brought a claim for negligent hiring, supervision, training, and retention against KCSO, but has conceded in briefing that, following discovery on this issue, this claim should be dismissed. [ECF No. 24 at 9].

leave to file a corrected affidavit. [ECF No. 28].

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(f) (D.S.C.). Because the summary judgment motion is dispositive, this report and recommendation is entered for review by the district judge. For the following reasons, the undersigned grants Plaintiff's motion for leave to file corrected affidavit and recommends the district judge deny in part and grant in part Defendants' motion for summary judgment.

I.     Factual Background

Plaintiff's claims arise out of allegations that Lawson and Spivey employed excessive force against Plaintiff in executing a search warrant for suspected drug operations on January 27, 2017, and that Plaintiff did not receive appropriate medical care thereafter.

A.     Plaintiff's Version of Events

On January 27, 2017, Plaintiff was staying at the Deluxe Inn in Camden, South Carolina. [ECF No. 28-1 ¶ 1]. Prior to his arrest, he was located in room 14 and standing in the bathroom doorway when the door to room 14 was kicked down. *Id.* ¶ 2. There was no knock, and Plaintiff was unaware of the police presence at the motel prior to the door being kicked in. *Id.* ¶¶ 2–3.

After the door was kicked in, Plaintiff stepped back from the bathroom doorway into the bathroom and partially closed the door in an attempt to

prevent the entry door for room 14 from hitting him. *Id.* ¶ 4. Plaintiff alleges

he "immediately realized that it was the authorities from all the screaming and

yelling they were asserting at the two ladies they encountered when they

entered the room." *Id.* ¶ 5.

Plaintiff opened the bathroom door and stood back in the doorway to

make his presence known and to ask what was happening. *Id.* ¶ 6. Plaintiff

alleges that because the officers had their backs turned, they were surprised

to see him standing behind them in the bathroom doorway. *Id.* ¶ 7. Spivey

turned to Plaintiff with what appeared to be an assault rifled pointed at

Plaintiff and asked to see Plaintiff's hands. *Id.* ¶ 8. Plaintiff alleges he

immediately complied and "threw [his] hands up in the air." *Id.* ¶ 9.

Spivey then approached, believed Plaintiff was trying to "swallow

evidence or something," and stated, "what do you have in your mouth." *Id.* ¶

10. When Spivey was able to make physical contact, he forced Plaintiff from

the bathroom doorway back into the bathroom and up against the bathroom

wall, pushing Plaintiff's head back and forth against the wall in an attempt to

force him to spit out whatever he assumed was in Plaintiff's mouth. *Id.* ¶ 11.

During this time, Spivey grabbed Plaintiff "by one of [his] arm[s] and placed it

behind [his] back and began twisting it in a way that purports with some type

of tactical maneuver that controlled [his] body movement." *Id.* ¶ 12. Plaintiff

alleges that "[b]ecause [his] lower body naturally and instinctively tried to

3

move in the direction officer Spivey was twisting [his] arm, [Spivey] began kneeing him to keep [his] lower body from moving as [Spivey] twisted [Plaintiff's] arm," all in an attempt to get Plaintiff to spit out whatever Spivey though was in Plaintiff's mouth. *Id.* ¶¶ 13–14.

Plaintiff alleges that at no point did he ever resist arrest or was he in possession of a gun at the time of his arrest. *Id.* ¶¶ 15, 17. Plaintiff alleges after he was handcuffed and placed in the parking lot area and after being thoroughly searched by Spivey, Lawson ordered Plaintiff to stand up. *Id.* ¶ 18. Plaintiff informed Lawson that his hip was hurting and that he needed help to stand up, and Lawson then "snatched" Plaintiff up. *Id.* Plaintiff's legs "gave way from sitting for so long," and as Plaintiff fell, Lawson "held [him] upright and kneed [him] in [his] groin area [because] he thought [Plaintiff] was trying to pull away from him." *Id.*

Plaintiff alleges he complained about his injuries, and he was "checked out and cleaned up" by one of the officers that was helping conduct the searches "because there was a lot of blood." *Id.* ¶¶ 19–20. Once at the detention center, Plaintiff alleges he informed the staff of his injuries, but he was told there was no nurse to see him at that time. *Id.* ¶ 21. Plaintiff states he repeatedly reported pain from the injury to his hip to employees of Kershaw County Detention Center ("KCDC") and that he remained in pain throughout his time there. *Id.* ¶ 22.

4

B.     Defendants' Version of Events

On January 27, 2017, KCSO deputies were serving multiple search warrants on different rooms of the Deluxe Inn located at 311 East Dekalb Street, Camden, South Carolina, 29020. [ECF No. 20-2 ¶ 6]. These search warrants were obtained by KCSO deputies after several controlled purchases of narcotics were made from Plaintiff in January 2017. *Id.* ¶ 7.

In the early morning hours at a meeting prior to the execution of the search warrants, Camden Police Department ("CPD") notified KCSO that Plaintiff was known to have a firearm in his possession and shots had been fired at the Deluxe Inn the day before. *Id.* ¶ 8. Spivey and Lawson allege that KCSO deputies were on a heightened state of alert given their new information that Plaintiff was likely armed. [ECF No. 20-2 ¶ 9, ECF No. 20-3 ¶ 9].

As KCSO deputies entered into the parking lot of the Deluxe Inn, Plaintiff, who resided in room 9 of the Deluxe Inn, spotted law enforcement and ran to room 14. [ECF No. 20-2 ¶ 10].[2] Spivey approached room 14, knocked, and announced his presence and intent to execute a search warrant on the

---

[2] As stated above, Spivey states in his affidavit that Plaintiff saw the police approach the motel and ran into room 14. [ECF No. 20-2 ¶10]. In Spivey's deposition he stated that at the time in question, Plaintiff was unknown to Spivey, and Spivey only knew a male had entered room 14. [ECF No. 24-2 at 9:13–24].

premises. *Id.* ¶ 13. Upon entering the room, Spivey observed Plaintiff flee into a bathroom and close the door despite verbal commands not to do so. *Id.* ¶ 14.

Two females were also in the room. *Id.* ¶ 15. Spivey first spoken with them and then attempted to open the bathroom door but found it was blocked. *Id.* ¶¶ 15–16.[3] Spivey forced the door open to find Plaintiff fully clothed, sitting on the toilet, and flushing the toilet. *Id.* ¶ 17. Defendants allege that deputies later determined that Plaintiff was attempting to flush heroin down the toilet. *Id.* ¶ 18. After stopping the toilet from flushing, Spivey told Plaintiff to show him his hands, but Plaintiff refused to comply and started to put his hands into the waistline of his pants. *Id.* ¶¶ 19–20.

Defendants alleges that due to Plaintiff's refusal to show Spivey his hands, and with the aforementioned knowledge that Plaintiff may be armed, Spivey used his body to pin Plaintiff's body against the bathroom wall so that his hands could be secured and any potential weapons identified. *Id.* ¶¶ 21–22.

After gaining control of Plaintiff, Spivey escorted him back to the bedroom area of room 14 where two other KCSO deputies assisted him in placing handcuffs on Plaintiff and escorting him into the parking lot of the

---

[3] As stated above, Spivey states in his affidavit that Plaintiff was in the room when he entered and ran to the bathroom despite commands not to. [ECF No. 20-2 ¶14]. However, Spivey testified in his deposition that he went into the motel room and encountered two females, the bathroom door was shut, and the unknown male was not visible in the room. [ECF No. 24-2 at 9:25–10:4].

Deluxe Inn. *Id.* ¶ 24. Spivey and Lawson allege that at no point in time did they kick or knee Plaintiff. [ECF No. 20-2 ¶ 25, ECF No. 20-3 ¶ 14]. Additionally, Spivey and Lawson allege Plaintiff never complained of any injuries he was suffering from or the need for medical treatment of any kind. [ECF No. 20-2 ¶ 26, ECF No. 20-3 ¶ 16].

Plaintiff was transported to KCDC where he was booked on January 27, 2017. [ECF No. 20-3 ¶ 6]. Defendants allege Plaintiff did not complain of any injuries to the corrections officers during the booking process. *Id.* ¶ 7. Ultimately, Plaintiff received medical care from a third-party medical care provider for an avulsion fracture to his left hip and made no further reference to the injury for months prior to being transferred to a different correctional facility. *Id.* ¶¶ 10–17.

II.    Discussion

A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact

7

cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.     Analysis

1.     Plaintiff's Motion for Leave to File a Corrected Affidavit

On April 20, 2020, with Plaintiff's opposition to Defendant's motion, Plaintiff's counsel submitted to the court Plaintiff's unsworn statement, describing the events in question. [*See* ECF No. 24-1]. Counsel notes such a statement "is not generally admissible at the summary judgment stage," informing the court that Plaintiff was unable to have the statement notarized

8

and that, "while it states it is made under oath, does not contain the required language from 28 U.S.C. § 1746." [ECF No. 24 at 1 n.1].[4] Counsel thereafter filed the instant motion for leave to file corrected affidavit, submitting to the court the same statement previously submitted, with the addition of the following language: "I declare under penalty of perjury that the foregoing is true and correct." [ECF No. 24 at 1 n.1, ECF No. 28, ECF No. 28-1].

Defendants argue in summary judgment briefing that Plaintiff's counsel has failed to offer an explanation as to why the unsworn statement "is so fundamentally flawed." [ECF No. 27 at 2–3].[5] However, Defendants filed no response to Plaintiff's motion, and, therefore, Defendants offer no argument that the corrected statement is not admissible nor any argument as to why the court should deny Plaintiff's motion.

---

[4] Under Fed. R. Civ. P. 56(c), a party opposing a motion for summary judgment may oppose by citing parts of the record including "affidavits or declarations." An unsworn statement can qualify under this rule as an affidavit if signed under penalty of perjury. *See* 28 U.S.C. § 1746 (noting that unsworn declarations can satisfy affidavit requirement only if signed under penalty of perjury); *see also Williams v. Sielaff*, No. 89-7750, 1990 WL 135721 (4th Cir. September 20, 1990) (holding that a statement made under penalty of perjury and declared to be true and correct to the best of declarant's knowledge qualifies as affidavit for opposition to motion for summary judgment purposes).
[5] In Plaintiff's motion, Plaintiff's counsel informs the court that during the time counsel was trying to secure a corrected statement from Plaintiff, who is incarcerated, "the COVID-19 outbreak began" and "[u]nder the best of circumstances, there is delay in communicating with clients in federal prisons," but "[b]ecause counsel's office has been closed, there were additional delays in obtaining an affidavit in the correct form." [ECF No. 28 at 2].

The Fourth Circuit has consistently expressed a "strong preference that cases be decided on their merits" rather than dismissed on procedural or technical grounds. *Choice Hotels Int'l, Inc. v. Goodwin and Boone*, 11 F.3d 469, 472 (4th Cir. 1993); *see also Reizakis v. Loy*, 490 F.2d 1132, 1135 (4th Cir. 1974) ("Against the power to prevent delays must be weighed the sound public policy of deciding cases on their merits."). In light of this well-established judicial preference, the undersigned finds that the interests of justice are best served by considering Plaintiff's corrected statement. Accordingly, the undersigned grants Plaintiff's motion to file the corrected affidavit.[6]

### 3. Defendants' Motion for Summary Judgment

#### a. Excessive Force Claim

Claims that law enforcement officials have used excessive force in the course of an arrest are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Determining whether the force used to carry out a particular arrest is "unreasonable" under the Fourth Amendment requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests

---

[6] Plaintiff has informed the court that Defendants had scheduled Plaintiff's deposition but then cancelled and elected not to take Plaintiff's deposition prior to filing the motion for summary judgment. [*See* ECF No. 28 at 1]. Thus, the only admissible evidence before the court recounting Plaintiff's version of the events in question is contained in his corrected statement.

against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). The outcome of this balancing test necessarily depends on the facts and circumstances of the particular case. *Id.* at 8–9 (holding question is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure"). Factors to consider in this analysis include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Further, the analysis "must embody allowances for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (citation omitted). Next, "[t]he court must also consider the extent of the injuries caused to the plaintiff." *Lassiter v. Reece*, C/A No. 3:07-885-HFF-JRM, 2008 WL 2852164, at *4 (D.S.C. July 22, 2008) (citing *Jones v. Buchanan*, 325 F.3d 520, 530–31 (4th Cir. 2003)).

Additionally, under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified

immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Here, Plaintiff and Defendants "present wildly disparate accounts of the arrest, putting in dispute the material facts at issue regarding the necessity of force used in arresting" Plaintiff. *Barfield v. Kershaw Cty. Sheriff's Office*, 638 F. App'x 196, 202 (4th Cir. 2016); *see also Witt v. W. Va. State Police*, 633 F.3d 272, 276 (4th Cir. 2011).

Defendants dispute almost every allegation made by Plaintiff. However,

12

taking facts in light most favorable to Plaintiff, as the court must at this juncture, Plaintiff alleges officers kicked down the door to his motel room without knocking. Spivey, who had an assault rifle trained on Plaintiff, demanded to see Plaintiff's hands, and Plaintiff immediately complied. Because Spivey believed Plaintiff had evidence in his mouth, Spivey pushed Plaintiff's head back and forth to get him to spit the alleged evidence out, grabbed one of Plaintiff's arm in a tactical maneuver, and then kneed Plaintiff to keep Plaintiff's lower body from moving in response to the arm twisting. Thereafter, Plaintiff was handcuffed and seated, post-search, and Lawson ordered Plaintiff to stand up. Although Plaintiff informed Lawson of a hip injury, Lawson snatched Plaintiff up, Plaintiff's legs gave way, and Lawson held Plaintiff up and kneed him in the groin area.

Here, assuming Plaintiff's version of events, Spivey and Lawson's actions were not objectively reasonable in light of the circumstances presented. Turning to the relevant factors to be considered, the first weighs in favor of Defendants, where, here, Defendants suspected Plaintiff was engaged in drug sales and in possession of a firearm. *See, e.g., Garcia v. McClaskey*, No. 1:12CV93, 2016 WL 2903234, at *7 (M.D.N.C. May 18, 2016) ("Suspicion of drug trafficking and firearm possession tip this factor in Rios's favor.") (citing *Whitebey v. Sarrge*, No. 7:11CV105, 2011 WL 6323134, at *11 (W.D. Va. Dec. 16, 2011) (concluding that the first *Graham* factor weighed against the plaintiff

where law enforcement officers suspected him of drug trafficking and possessing a firearm at the time of his arrest)).

However, the second and third factors weigh in Plaintiff's favor. First, Plaintiff did not pose an immediate threat to the officers or others. He did not possess a weapon at the time of his arrest,[7] and when confronted by Spivey, Plaintiff alleges Spivey had a weapon trained on him and Plaintiff was immobile, with his hands raised. *See, e.g., Yates v. Terry*, 817 F.3d 877, 885–86 (4th Cir. 2016) ("Regarding the second *Graham* factor, whether Yates posed an immediate threat to the safety of the police or others, we also conclude that this factor favors Yates. The evidence shows that Yates, who was unarmed, complied with Terry's orders to place his hands on the car before Terry tased him for turning his head . . . . In this case, viewing the evidence in the light most favorable to Yates, the evidence does not support an inference that Yates was a danger to Terry at any time during their encounter.").

Defendants disagree, arguing as follows:

The information available to the officers at the time of Plaintiff's arrest was simply that there had been shooting the night prior to the execution of the warrants and that Plaintiff, in particular, was likely in possession of a firearm. Moreover, at the time of Plaintiff's arrest, Plaintiff had not been searched and the officers had reasonable grounds to believe Plaintiff could pose a threat to their

---

[7] As conceded by Plaintiff, "[a] gun was found during the execution of the search warrant and Plaintiff was charged with it. However, he was arrested in Room 14 of the motel and records reflect the gun was found in Room 9." [ECF No. 24 at 4 n.2].

safety and others.

[ECF No. 27 at 7]. However, the court's focus is on the time the relevant force was employed. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) ("In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed."). Plaintiff alleges Spivey had a weapon trained on him and Plaintiff was immobile with his hands raised prior to Spivey employing his alleged use of force. Likewise, Plaintiff alleges he was handcuffed and had been searched prior to Lawson employing his alleged use of force. Plaintiff's allegations do not support the conclusion that a reasonable officer would have believed Plaintiff posed an immediate threat at the relevant points in time.

Turning to the third factor, Plaintiff alleges he was not actively resisting arrest or attempting to evade arrest by flight. He denies fleeing from the police or even being aware of their presence before Spivey entered his motel room. He denies barricading himself into the bathroom or that he attempted to destroy evidence as alleged by Defendants. Instead Plaintiff alleges he immediately acquiesced to all instructions given him by Spivey and Lawson.

Regarding this factor, Defendants argue that although Plaintiff alleges he was not resisting arrest, he also alleges that he believed Spivey and Lawson thought he was, and responded accordingly, in that Plaintiff alleges Spivey kneed his lower body in an attempt to keep his lower body from moving and

Lawson kneed him in the groin area because he thought Plaintiff was attempting to pull away. [*See* ECF No. 27 at 7–8, ECF No. 28-1 ¶¶ 13, 18].

To the extent Plaintiff is alleging Spivey and Lawson subjectively believed Plaintiff was resisting arrest, Plaintiff also alleges he at no point resisted arrest. Additionally, the court does not consider an officer's "intent or motivation." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97). Rather, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* (citing *Graham*, 490 U.S. at 396–97). Here, as already stated above, taking facts in light most favorable to Plaintiff, Plaintiff was not actively resisting arrest or attempting to evade arrest by flight, and a reasonable juror could conclude Spivey and Lawson unreasonably employed the force used.[8]

Viewing facts in light most favorable to Plaintiff for the purposes of

---

[8] Defendants also argue Plaintiff's current allegations, that Plaintiff was kneed in the lower body and groin, contradict what Plaintiff asserted in his complaint, that Defendants "kicked, kneed, or otherwise used force on Plaintiff during his arrest" and, as a result, Plaintiff's hip was broken. [*See* ECF No. 27 at 4–5 (citing ECF No. 1 ¶¶ 14–15)]. However, that Plaintiff now alleges he was kneed in the lower body and groin, and not specifically in the hip, does not indicate Plaintiff has put forth inconsistent allegations to those alleged in his complaint. Although Defendants appear to argue otherwise, *id.* at 5, it is not clear on the record before the court that being kneed in the lower body and groin would not result in the injuries Plaintiff alleges he received. Further, it is undisputed that Plaintiff suffered a fracture to his hip at some point.

16

summary judgment and the first prong of qualified immunity, a reasonable fact finder could determine that Spivey and Lawson were not objectively reasonable in the force they employed during Plaintiff's arrest. A reasonable jury could find that both Spivey and Lawson used unnecessary force in light of Plaintiff's compliant behavior and not because they believed Plaintiff posed an immediate threat to their safety or because they reasonably believed he was actively resisting arrest or attempting to evade arrest or that he was likely to do so. Therefore, having determined a Fourth Amendment violation, the court turns to whether Plaintiff's rights were "clearly established" at the time of the violation.

Although Defendants cite the relevant case law regarding qualified immunity and argue that, in this case, they "took reasonable action in executing the warrants that led to Plaintiff's arrest and incarceration and did not engage in the use of excessive force such that Plaintiff's constitutional rights would be violated," [ECF No. 27 at 9], they do not specifically address the question of whether the rights at issue were clearly established at the relevant time.

The Fourth Circuit has explained that although the burden is on the plaintiff to prove that a constitutional violation occurred, the defendant must prove that the right was not clearly established. *Henry*, 501 F.3d at 377–78;

*see also Bryant v. City Of Cayce*, 332 F. App'x 129, 132 (4th Cir. 2009) (same).[9]

Here, Plaintiff has successfully met his burden of demonstrating that a constitutional violation occurred. However, Defendants have not met their burden to show that they are entitled to qualified immunity. Accordingly, the undersigned recommends denying Defendants' motion for summary judgment as to Plaintiff's excessive force claim.

c.     Battery Claim

The SCTCA is "the exclusive remedy for any tort committed by an employee of a governmental entity." S.C. Code Ann. § 15-78-70(a). "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained" within the SCTCA. S.C. Code Ann. § 15-78-40. As relevant here, the SCTCA additionally provides a "governmental entity is not liable for the loss resulting from . . . employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60 (17); *see also id.* at § 15-78-70(b).

---

[9] Despite the above-cited case law, Defendants appear to argue it is not their burden to prove the rights at issue were not clearly established. [*See* ECF No. 27 at 5 ("Plaintiff has not alleged, nor cited any case law, supporting a finding that Defendants violated a clearly established constitutional right.")].

Plaintiff asserts a claim of battery pursuant to the SCTCA against KCSO. Defendants argue in response that (1) KCSO has not waived sovereign immunity, (2) intentional torts against KCSO are barred by the SCTCA, and (3) Plaintiff's arrest was supported by probable cause.

First, the burden of showing a liability limitation or exception to the SCTCA's waiver of immunity is on the government entity asserting the affirmative defense. *Steinke v. S.C. Dep't of Labor, Licensing & Regulation*, 520 S.E.2d 142, 152 (S.C. 1999). Defendants have failed to carry their burden. Although it appears that Defendants argue otherwise, [ECF No. 20-1 at 14], the SCTCA "waives sovereign immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties." *Proctor v. Dep't of Health & Envtl. Control*, 628 S.E.2d 496, 502 (S.C. Ct. App. 2006) (citation omitted). Because Plaintiff brings a battery claim pursuant to the SCTCA against KCSO's employees alleged to be acting within the scope of their official duties, KCSO is the appropriate defendant for this claim. *See* S.C. Code Ann. § 15-78-70(c) (noting that claims brought pursuant to the SCTCA against an employee acting within the scope of his official duties must be brought against the agency or political subdivision for which the employee was acting at the time).

Defendants additionally argue the court should grant summary judgment on Plaintiff's battery claim because battery requires "intent to harm"

19

which falls under one of the enumerated portions of the SCTCA. [ECF No. 20-1 at 15–16]. However, under South Carolina law, battery is defined as the "actual infliction of any unlawful, unauthorized violence on the person of another, irrespective of its degree." *Barfield*, 638 F. App'x at 201 (citing *Jones v. Winn–Dixie Greenville*, Inc., 456 S.E.2d 429, 432 (S.C. Ct. App. 1995)). "[W]hen a Sheriff's deputy uses 'force greater than is reasonably necessary under the circumstances' the governmental agency may be liable for battery." *Id.* (citing *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671–72 & n. 2 (D.S.C.1995); *see also Newkirk v. Enzor*, 240 F. Supp. 3d 426, 435–37 (D.S.C. 2017) (holding § 15–78–60(17) did not automatically bar the plaintiff's SCTCA claims for assault, battery, malicious prosecution, and false imprisonment simply because they were intentional torts, and noting "each tort [the plaintiff] alleges could be committed without actual malice or intent to harm"); *Simmons v. Charleston Cty. Sheriff's Office*, C/A No. 2:19-1754-BHH, 2019 WL 5387911, at *1 (D.S.C. Oct. 22, 2019) ("The governmental agency, in this case CCSO, may be liable for the assault and battery."); *Meyer v. McGowan*, C/A No. 2:16-00777-RMG, 2018 WL 4462367, at *5 (D.S.C. Sept. 18, 2018) (same).[10]

---

[10] Defendants cite two cases that appear to hold otherwise. *See Kinard v. City of Greenville*, C/A No. 6:10-3246-TMC, 2012 WL 1340103, at *7 (D.S.C. Apr. 18, 2012) ("the City has immunity for the claims made against it for the intentional tort of assault and battery"); *Yates v. Zumalt*, C/A No. 2:11-02289-CWH, 2015 WL 12910629, at *3 (D.S.C. Apr. 23, 2015) (holding that because the officer-defendant was alleged to have "intent to harm" the plaintiff, the

Whether immunity applies depends upon the facts of the case, and, where, as here, material facts are disputed, summary judgment is inappropriate and "[i]mmunity under the statute is an affirmative defense that must be proved by the defendant at trial." *Newkirk*, 240 F. Supp. 3d at 437. (citing *Frazier v. Badger*, 603 S.E.2d 587, 590 (S.C. 2004)).

Finally, Defendants appear to argue that because Spivey was in possession of a search warrant, he had probable cause to enter the room where Plaintiff was located, and therefore Plaintiff's claim for battery should be dismissed. [ECF No. 20-1 at 17]. In support, Defendants cite *McCoy v. City of*

---

city-defendant was not amendable to suit for state-law claims, including battery, and those claims were to proceed against the officer-defendant individually). First, to the extent these cases support the proposition that § 15–78–60(17) automatically bars a plaintiff's SCTCA claims for battery against a governmental entity, these cases are inconsistent with the above-cited case law. Second, to the extent *Yates* dismisses intentional tort claims against a governmental entity as barred by the SCTCA, allowing those claims to proceed against officer-defendants individually, such is distinguishable from the instance. As explained in *Newkirk*:

> . . . . under the SCTCA, for a given tort, either the governmental entity or the employee is liable but not both. An employee of a governmental entity who commits a tort while acting within the scope of his official duty is not liable and the plaintiff must sue the governmental agency itself. *Roberts v. City of Forest Acres*, 902 F. Supp. 662, 671 (D.S.C. 1995) (citing S.C. Code § 15–78–70(a)). "However, if the plaintiff proves that 'the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude,' then the governmental agency is not liable, and the employee is personally liable." *Id.* (quoting S.C. Code § 15–78–70(b)).

*Newkirk*, 240 F. Supp. 3d at 436.

*Columbia*, wherein the court held as follows:

> Finally, a law enforcement officer who uses reasonable force in effecting a lawful arrest is not liable for assault or battery However, if the officer uses excessive force, or "force greater than is reasonably necessary under the circumstances," the officer may be liable for assault or battery. Although McCoy's Amended Complaint does not allege that the Officer Defendants used excessive force during the arrest, in his deposition McCoy testified that the Officer Defendants applied excessive force by pushing him, by handcuffing and arresting him, and by taking him to jail. Still, McCoy acknowledged that he was not physically injured in any way during the arrest. In light of this evidence and in view of the video evidence of the arrest, the court finds that the Officer Defendants did not use excessive force in effecting the lawful arrest of McCoy. Although the Officer Defendants did push McCoy, they clearly did so to move McCoy away from the scene of McAlister's arrest. This was reasonable under the circumstances. Moreover, because probable cause supported McCoy's arrest, handcuffing him and taking him to jail was likewise reasonable. Therefore, neither the City nor the Officer Defendants are liable for assault and battery.

*McCoy v. City of Columbia*, 929 F.Supp.2d 541, 567 (D.S.C. March 11, 2013) (citations omitted). Here, however and unlike in *McCoy*, there are triable issues of fact as to the amount of force used to make Plaintiff's arrest. *See, e.g., id.* ("if the officer uses excessive force . . . the officer may be liable for assault or battery"); *Roberts*, 902 F. Supp. 662 at 671 n.2 (noting a police officer who uses force greater than necessary under the circumstances to make an arrest can be liable for assault and battery). [11]

---

[11] To the extent Defendants argue that Plaintiff's battery claim fails because of Plaintiff's failure to present evidence of underlying tortious conduct by Lawson and Spivey not addressed above, as has been stated, Plaintiff and

Accordingly, the undersigned recommends denying Defendants' motion as to Plaintiff's battery claim.

> d.     Negligence/Gross Negligence Claims

Plaintiff brings claims of negligence and gross negligence against KCSO and Kershaw County regarding his alleged lack of medical treatment following his arrest. Defendants argue that Plaintiff's claims fail because KCSO "does not operate the Kershaw County Detention Center and is not liable for the actions or inactions of employees of the Kershaw County Detention Center" and because Kershaw County "showed at least slight care in its treatment of Plaintiff." [ECF No. 20 at 20–21].[12]

To maintain an action for negligence, "a plaintiff must show: (1) the defendant owes a duty of care to the plaintiff; (2) the defendant breached that duty by a negligent act or omission; (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury; and (4) the plaintiff suffered an injury or damages." *Roddey v. Wal-Mart Stores E., LP*, 784 S.E.2d 670, 675

---

Defendants have presented very different accounts of what occurred during Plaintiff's arrest. Taking facts in light most favorable to Plaintiff, there are triable issues of fact as to whether Lawson and Spivey exerted "unlawful, unauthorized violence on [Plaintiff], irrespective of its degree." *Barfield*, 638 F. App'x at 201.

[12] Defendants also argue that Plaintiff's negligence and gross negligence claims against Kershaw County fails because, like KCSO, Kershaw County has not waived sovereign immunity. [*See* ECF No. 20-1 at 13–14]. For the reason stated above regarding KCSO, the court rejects Defendants' argument.

(S.C. 2016) (citation omitted). However, the SCTCA additionally provides that a governmental entity is not liable for a loss resulting from the "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any . . . prisoner, inmate . . . except when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15–78–60(25).

"Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000) (citation omitted). It is the failure to exercise even "slight care." *Id.* Gross negligence has also been defined as a "relative term, and means the absence of care that is necessary under the circumstances." *Hollins v. Richland Cty. Sch. Dist. One*, 427 S.E.2d 654, 656 (S.C. 1993). Gross negligence is ordinarily a mixed question of law and fact. *Clyburn v. Sumter County School Dist. #17*, 451 S.E.2d 885, 887 (S.C. 1994). However, "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court." *Etheredge*, 534 S.E.2d at 277.

Here, Plaintiff does not provide any evidence to refute Defendants' evidence that KCSO is not the proper defendant for Plaintiff's claims of negligence and gross negligence. Additionally, Plaintiff concedes that pursuant to the SCTCA he cannot maintain a claim for negligence, only gross negligence,

arguing only that he "received absolutely no treatment for a fractured hip." [ECF No. 24 at 9–10].

Turning to Plaintiff's gross negligence claim against Kershaw County, medical records submitted by Defendants reveal that Kershaw County exercised some care in treating Plaintiff's hip.

Plaintiff was booked into KCDC on January 27, 2017, and, as part of Plaintiff's booking, a medical history of Plaintiff was conducted. [ECF No. 20-5]. This report notes that Plaintiff was not suffering from any visible trauma at the time of his booking. *Id.* The first instance in the record of Plaintiff complaining of his injuries occurred on February 4, 2017, when he submitted a sick call slip for "increased pain in groin, hip and loose tooth." [ECF No. 20-6]. Plaintiff was seen by medical providers with Southern Health Partners ("SHP") on February 8, 2017, at which point he recounted that he was "kneed" in the left hip and left inner thigh during his arrest, along with other injuries. [ECF No. 20-7].[13] At that time, SHP medical providers prescribed Plaintiff Tylenol and ordered regular blood pressure checks. *Id.*

Plaintiff next complained of injuries to KCDC staff on February 12, 2017, submitting a sick call slip complaining of hip pain and an ear infection. [ECF

---

[13] Defendants have submitted the contract between Kershaw County and SHP which states in part that SHP is to "provide for the delivery of all medical, dental and mental health services of inmates." [ECF No. 20-21 at 1].

No. 20-8]. Plaintiff was seen on February 15, 2017, and SHP medical providers followed up with Plaintiff on March 1, 2017, and advised Plaintiff of the results of an x-ray conducted on February 14, 2017, indicating a greater trochanteric irregularity in Plaintiff's left hip. [ECF No. 20-4 ¶ 13, ECF No. 20-8, ECF No. 20-9, ECF No. 20-11 at 1]. Plaintiff requested an MRI, and SHP medical providers informed Plaintiff that because his injury predated his booking into the detention center, Plaintiff would be required to pay the full cost of any MRI up front. [ECF No. 20-9].

Plaintiff was seen on March 16, 2017 for additional x-rays of his hip. [ECF No. 20-11]. On March 22, 2017, Plaintiff was again seen by SHP medical providers as part of a routine blood pressure check. [ECF No. 20-10]. At this appointment, the medical provider asked if Plaintiff was told anything while at the ER for his second set of x-rays, and the medical provider then reviewed Plaintiff's x-rays and advised that the area of his hip that was fractured had improved in the second x-ray. *Id.* The medical provider explained that his hip injury was not the type that typically required surgery and would improve over time. *Id.*

Plaintiff was next seen on March 28, 2017, wherein Plaintiff requested an exact time frame for his hip fracture to heal. [ECF No. 20-12]. The SHP medical provider explained that his healing will take time. *Id.*

Plaintiff submitted an inmate-to-staff request form on April 14, 2017,

advising that he was in need of further treatment for the pain in his hip. [ECF No. 20-13]. Plaintiff was advised by medical providers to submit a sick call slip for treatment. *Id.* Plaintiff submitted a sick call slip on April 19, 2017, complaining of pain in his hip, above the knee, and the bottoms of his feet, as well as daily headaches and inability to sleep. [ECF No. 20-14]. SHP medical providers received this sick call slip on April 19, 2017, *id.*, and saw Plaintiff on April 21, 2017, prescribing Plaintiff additional medication. [ECF No. 20-15].

Plaintiff submitted a sick call slip on April 24, 2017, again requesting MRIs and a CAT scan. [ECF No. 20-16]. SHP medical providers responded that same day reiterating that Plaintiff would need to pay for the costs of this treatment up front. *Id.* Plaintiff indicated that he would speak to his family in that regard. *Id.* On April 25, 2017, Plaintiff was again seen for radiological views of his hip, and the physician's impressions noted there was no acute femoral neck fracture and an age-indeterminate greater trochanteric avulsion fracture. [ECF No. 20-17].

Plaintiff submitted a sick call request on April 27, 2017, wherein he advised he could not afford the cost of the additional medical treatment he was seeking. [ECF No. 20-18]. In this submission, Plaintiff requested assistance in obtaining a medical bond so that he could seek treatment medical care of his "own volition and accord." *Id.* Plaintiff was advised that the medical providers at KCDC have nothing to do with his bond. *Id.*

27

Plaintiff submitted another sick call request on May 4, 2017, asking who should talk to for assistance with his medical issues. [ECF No. 20-19]. SHP medical providers responded as follows: "Talk to your lawyer. Your hip is healing well. Your lawyer or family member can talk to the judge [on] your behalf, but medical cannot alter a bond." *Id.* Plaintiff did not submit another sick call request until August 24, 2017, seeking information related to what medications he was taking. [ECF No. 20-20]. Plaintiff was advised this medication was for his blood pressure. *Id.* Based on the record before the court, no further requests for treatment or treatment occurred during Plaintiff's time at the KCDC, and Plaintiff left KCDC's custody September 20, 2017. [ECF No. 20-4 ¶ 16].

Plaintiff argues that the "detention center made it clear there would be no treatment for the fracture because of the cost involved." [ECF No. 24 at 9–10]. However, Plaintiff does not dispute the medical records provided by Defendants that show KCDC referred Plaintiff to medical treatment with SHP in response to all of his requests, he received pain medication and underwent multiple rounds of x-rays, and he was recovering from his injuries during the time he was at KCDC.

Because the undisputed record reveals no triable issue of fact regarding Plaintiff's negligence and gross negligence claim, the undersigned recommends the district judge grant Defendants' motion for summary judgment regarding

28

these claims.

III.    Conclusion and Recommendation

Plaintiff's motion to file corrected affidavit is granted. [ECF No. 28]. For the foregoing reasons, the undersigned recommends the district judge grant in part and deny in part Defendants' motion for summary judgment, dismissing Plaintiff's claims for negligent hiring, supervision, training, and retention against KCSO, as well as claims for negligence and gross negligence against KCSO and Kershaw County. [ECF No. 20].

IT IS SO RECOMMENDED.

June 1, 2020                              Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).